UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PEOPLEGURU, INC.,

     Plaintiff,

v.                                                    Case No. 8:23-cv-1313-CPT

MEDICINE MAN TECHNOLOGIES,
INC.,

     Defendant.
_____/

## O R D E R

Plaintiff PeopleGuru, Inc. (PeopleGuru) initiated this breach of contract action against Defendant Medicine Man Technologies, Inc., d/b/a/ Schwazze (Schwazze) in state court. (Doc. 1-1). Following removal to this Court on the basis of diversity jurisdiction (Doc. 1), the case proceeded to a bench trial. (Docs. 85, 86). During PeopleGuru's case-in-chief, it elicited testimony from its Chief Executive Officer, Richard Cangemi; its Finance and Treasury Manager, Phil Krakowski; its Director of Operations, Karen Erne; and its former strategic account manager, Olga Evseeva.

At the completion of PeopleGuru's case-in-chief, Schwazze orally moved for a directed verdict, citing Federal Rule of Civil Procedure 50 (Doc. 80); (Doc. 85 at 157) or, alternatively, a judgment on partial findings, citing Rule 52(c) (Doc. 82); (Doc. 86 at 5–10, 142–44). The Court reserved ruling on both of those motions. (Doc. 85 at

162–63, 164, 168); (Doc. 86 at 9–10).  Schwazze then called as its witnesses its Chief Legal Officer, Christine Jones; its former general counsel and current Chief Policy Officer, Dan Pabon; and its Vice President (VP) of Human Resources, Dan Bonach. At the close of its proof, Schwazze renewed its Rule 50 and 52(c) motions, and the Court again reserved ruling on them.  (Doc. 86 at 142–144).

In accordance with the Court's subsequent directive (Doc. 84), the parties filed post-trial briefs setting forth their respective positions regarding the testimony and exhibits introduced at trial.  (Docs. 89, 90, 91, 92).  The Court then heard oral argument on the matter after its careful review of those filings.

Having considered the parties' submissions, along with the evidence adduced at trial, the applicable law, and the assertions of counsel, the Court makes the following findings of fact and conclusions of law.[1]  Unless otherwise indicated, the Court's factual findings are predicated upon its assessment of the weight of the evidence offered by the parties, including the testimony of the above-referenced witnesses.

I.

PeopleGuru is a software developer based in Hillsborough County, Florida that specializes in human resources and payroll applications.  (Doc. 90 at 2); (Doc. 85 at 13).  During the relevant period, PeopleGuru provided software and hardware-related services to approximately two hundred entities with which it contracted.  (Doc. 85 at 13, 21).  The software services that PeopleGuru furnished pertained to "everything

---

[1] To the extent that any finding of fact herein constitutes a conclusion of law, or vice versa, it is adopted as such.

from the hiring process through the termination process, and all the administration [in] between," including employee on-boarding, handling W-2's and other payment forms, printing checks, and managing state and local tax filings.  *Id*. at 13–14. PeopleGuru's hardware services consisted of, among other things, kiosks configured with PeopleGuru's proprietary software that were set-up at a client's place of business and that the client's employees could use to access PeopleGuru's system.  *Id*. at 15, 21–23.

As far as payment for these services was concerned, PeopleGuru charged the full price each month under its contracts with its customers if it was "active[ly] processing" the clients' accounts.  (Doc. 85 at 33–34).  Otherwise, PeopleGuru would assess its clients only a minimum monthly fee to access PeopleGuru's "basic software system," which essentially reduced the clients' bills by fifty percent.  (Doc. 85 at 124); *see also* (Doc. 92 at 6); (Doc. 85 at 20, 24, 33–34, 85, 147).

In or around February 2020, Schwazze entered into a contract with PeopleGuru to have PeopleGuru provide it with software and hardware-related services.  (Doc. 85 at 34, 115–16).  A vertically integrated cannabis company, Schwazze owned and operated as many as sixty-five dispensaries in Colorado and New Mexico during the pertinent time frame.  (Doc. 85 at 171); (Doc. 89 at 2).

The contract between Schwazze and PeopleGuru was drafted by PeopleGuru and was comprised of three parts: a "Master Agreement" containing legal terms, warranties, and indemnities; an "Order Form" establishing, among other things, the pricing for the specific services PeopleGuru was to supply Schwazze and the number

3

of employees covered by those services; and a document entitled "Order Form Terms and Conditions" setting forth—as indicated by the title—the terms and conditions for each particular Order requested by Schwazze. (Doc. 85 at 35–39); (Doc. 89 at 2–3); (Doc. 93-1); (Doc. 93-2); (Doc. 93-3). For the sake of simplicity, the entirety of the contract between Schwazze and PeopleGuru will be referred to herein as the "Agreement," except where a more detailed description is necessary.

The parties' dispute in this lawsuit centers on one of the provisions in the parties' Agreement. (Doc. 93-2). That provision—found in section 1.6 of the Order Form Terms and Conditions—stated, in relevant part:

> The initial term of th[e] Agreement shall commence as of the execution date and shall continue until the First Anniversary Date. Thereafter, and unless either party delivers thirty (30) days written notice of non-renewal prior to each Anniversary Date, . . . the term of th[e] Agreement shall automatically renew for one (1) year periods on the Anniversary Date.

*Id.* at 2. The Agreement defined the "Anniversary Date" as the "annual renewal date of th[e] Agreement, which occur[red] on November 1[ of ] . . . each year." *Id.* at 1. If Schwazze failed to tender timely written notice to PeopleGuru in accordance with section 1.6, PeopleGuru required Schwazze to pay it at least the minimum monthly fee for software services through the end of the subsequent one-year renewal period that terminated on October 31. (Doc. 85 at 19–20). PeopleGuru's CEO, Cangemi, explained the justification for section 1.6 as follows:

> We provide a dedicated team for [our] customers. That team is at least two people, sometimes three. In an account like Schwazze, which was a very active and [a] growing business, we would have three people

4

> assigned to that account.  In order for us to provide that level of service, it[ was] very important that we have the ability to keep these people employed.  And our ratio of people to customers is much smaller than [one of our competitors,] ADP.  You might see over a hundred or close to [two hundred] accounts [assigned] to . . . each ADP representative.  In our business, it's much smaller, it's more like [twenty-five].  So having these agreements with some predictability gives us the ability to field that team without the concern that they won't be gainfully employed for a future period.  So that's why we do it this way.  It's an important . . . part of the reason why customers choose PeopleGuru.

*Id.* at 20–21.

Schwazze began receiving services from PeopleGuru on April 1, 2020.  *Id.* at 35.  At the time, Schwazze had only sixty-five employees.  *Id.*  Over roughly the next two years, the parties executed several revised Order Forms to reflect new pricing for the increasing number of Schwazze employees covered by the Agreement.  (Doc. 86 at 50).  By 2022, PeopleGuru was supplying payroll and other services for 659 workers at Schwazze.  (Doc. 85 at 140, 144); (Doc. 86 at 50).

In or around October 2022, Schwazze's management elected to discontinue using PeopleGuru and to retain a different vendor instead.  (Doc. 86 at 11–13, 44).  According to Schwazze's VP of Human Resources, Bonach, Schwazze made this decision because it had "simply outgr[own]" PeopleGuru and because it would also save a significant amount of money by doing so.  *Id.* at 77–78.  To effectuate this change, Schwazze executed a contract with the other vendor that became effective on December 1, 2022.  *Id.* at 44–45.

On October 31, 2022, Bonach sent an email to PeopleGuru stating that the email constituted Schwazze's written "Notice of Termination" and notice of nonrenewal of the parties' Agreement effective January 1, 2023.  (Doc. 93-9).  In his email, Bonach inquired about the manner in which the transition to the new vendor would be implemented, as he wanted to make sure that the historical data PeopleGuru had acquired during the course of the parties' relationship was preserved.  (Doc. 85 at 155); (Doc. 86 at 53).  Notwithstanding this correspondence, the parties continued to interact with each other about business matters during the months of November and December 2022, and Schwazze paid PeopleGuru the full price under the contract for this time frame.  (Doc. 93-29); (Doc. 89 at 6).

On January 3, 2023, a representative at PeopleGuru, Krakowski, provided Schwazze with a formal response to Bonach's October 31, 2022, email.[2]  In his response, Krakowski advised that Schwazze's notice of termination and non-renewal was untimely and that Schwazze "would continue to be responsible [for its contractual obligations] through October 31[ ], 2023."  (Doc. 93-14).  Krakowski added that after October 31, 2023, "the system w[ould be deleted, and [Schwazze] w[ould] have no further payment obligation[.]"  *Id*

Despite this exchange between PeopleGuru and Schwazze, the two parties still interfaced with each other in the first few months that followed.  In January 2023, for example, a payroll specialist at Schwazze, Tristan Parsons, discovered that

---

[2] This email was preceded by other communications between the parties relative to Schwazze's non-renewal of the Agreement.  *See, e.g.,* (Doc. 86 at 98); (Doc. 93-10); (Doc. 89 at 6).

PeopleGuru improperly issued a check to an individual for a period when the individual was not employed by Schwazze. (Doc. 85 at 105–06); (Doc. 89 at 7).  As a result of this discovery, Parsons accessed PeopleGuru's payroll software to request that PeopleGuru void the W-2 transmitted to the individual and remove the employee from their system.  (Doc. 85 at 106).  Parsons additionally logged into PeopleGuru's system in January 2023 to collect historical data Schwazze requested from PeopleGuru but which PeopleGuru failed to furnish Schwazze.  (Doc. 86 at 136); (Doc. 89 at 5–6).

By way of another example, Schwazze contacted PeopleGuru in February 2023 about a Social Security Administration (SSA) audit, which led PeopleGuru to forward certain materials to the SSA.  (Doc. 93-22).  By way of a further example, a Schwazze employee accessed PeopleGuru's system a few weeks later to correct a perceived error in another W-2 for a Schwazze employee.  (Doc. 85 at 43); (Doc. 89 at 8); (Doc. 93-31).

Along with these interactions between Schwazze and PeopleGuru in early 2023, PeopleGuru provided tax-related services to Schwazze for prior tax years as well.  (Doc. 85 at 109, 110, 145).  This included processing and shipping W-2s and 1095s for Schwazze.  (Doc. 93-18); (Doc. 93-21).  According to testimony received at trial, it was PeopleGuru's practice to offer such assistance to its clients even if its contracts with the clients had concluded.  (Doc. 85 at 109–11, 145); (Doc. 89 at 7).

Although Schwazze accessed PeopleGuru's payroll system on a very limited basis in January and February 2023, PeopleGuru charged Schwazze the full price under the Agreement for this time frame on the theory that it was still actively

processing Schwazze's account. (Doc. 93-14); (Doc. 93-13); (Doc. 93-20). This price was comprised of an "Enterprise Guru" base fee of $2,480.80, an "Enterprise Guru" employee fee of $12.41 per employee for 659 employees, and various other fees and charges.[3] Accounting for taxes, the total amounts assessed to Schwazze for January and February 2023 were $23,658.35 and $23,420.62, respectively. (Doc. 93-13). PeopleGuru also separately charged Schwazze $7,163.29 and $6,810.30, respectively, for compiling and shipping the W-2 and 1095 forms for Schwazze. (Doc. 93-21); (Doc. 93-29).

Schwazze paid the complete sum to PeopleGuru for January 2023, albeit perhaps unintentionally (Doc. 85 at 143); (Doc. 93-26); (Doc. 93-14); (Doc. 90 at 9),[4] but did not remit any monies to PeopleGuru for February 2023 (Doc. 93-29); (Doc. 90 at 9-10); (Doc. 86 at 61). With the exception of paying the $7,163,29 it owed PeopleGuru for its handling of the W-2s, a step which Schwazze belatedly undertook in the Fall 2023 (Doc. 85 at 46, 84, 120–21, 128, 137); (Doc. 86 at 64); (Doc. 91 at 7);

---

[3] These other fees and charges in January 2023 consisted of a Payroll Tax Administration Service base fee of $1,124.45, a Payroll Tax Administration Incremental Fee of $5.63 per employee for 659 employees, a Total Tax Agency fee of $140.60, a TimeAttend Guru Base Fee of $5,890.52, a shipping fee of $168.48, and an ACH fee of $50. (Doc. 93-13). While there was some evidence that the per-employee Enterprise Guru fee was $11.25, *see, e.g.* (Doc. 93-14), the price became $12.41 per employee in 2023 due to service fee increases over the two-plus years that Schwazze was PeopleGuru's client. (Doc. 85 at 115–16). As for the month of February 2023, these other fees and charges included a Payroll Tax Administration Service base fee of $1,124.45, a Payroll Tax Administration Incremental Fee of $5.63 per employee for 659 employees, a TimeAttend Guru Base Fee of $5,890.52, and a Total Tax Agency fee of $140.60. (Doc. 93-20).

[4] The January 2023 payment was made via an automatic debit that Schwazze had yet to terminate. (Doc. 90 at 9); (Doc. 93-13).

(Doc. 93-18); (Doc. 93-33),[5] Schwazze did not compensate PeopleGuru for the tax-related services PeopleGuru furnished it in February 2023 (Doc. 93-29). Nor did Schwazze pay the contractual interest—totaling $978.53—due and owing on the belated the $7,163,29 payment. (Doc. 90 at 8); (Doc. 93-3); (Doc. 85 at 46).

In late March 2023, PeopleGuru suspended Schwazze's utilization of its system. As a result of this action, Schwazze's employees could still access a W-2 or paycheck stub on PeopleGuru's servers, but Schwazze's administrators could not "actively use the system." (Doc. 85 at 45, 85).

Between March 2023 and October 2023, PeopleGuru charged Schwazze its minimum monthly fee, which included only an Enterprise Guru base fee of $2,480.40 and an Enterprise Guru employee fee of $12.41 for 659 employees.[6] (Doc. 93-27); (Doc. 93-29); (Doc. 92 at 6). Schwazze did not make these payments either. (Doc. 90 at 10); *see* (Doc. 89 at 8).

## II.

## A.

Where, as here, a case is tried without a jury, Rule 52 directs that the trial "court must find the facts specially and state its conclusions of law separately," either on the record after the close of evidence or in an opinion filed by the court. Fed. R. Civ. P.

---

[5] Schwazze conceded during the trial and in its proposed Findings of Fact and Conclusions of Law that it owes PeopleGuru the invoiced sum of $6,810.30 for PeopleGuru's processing and shipping of the 1095s for Schwazze. *See* (Doc. 86 at 112); (Doc. 89 Ex. A).

[6] PeopleGuru also charged Schwazze $8,812.54 in late fees in March 2023 (Doc. 93-28), but the parties now agree that these charges were either "removed" or the result of a "miscalculation." (Doc. 85 at 137, 138); (Doc. 86 at 69).

52(a).  Rule 52 authorizes a trial court to make partial findings on a claim or defense heard during a bench trial as well.  Fed. R. Civ. P. 52(c).

Rule 52, however, does not necessitate "a finding on every contention raised by the parties," *Feazell v. Tropicana Prods., Inc.*, 819 F.2d 1036, 1042 (11th Cir. 1987), or call upon a trial court to engage in an "'overelaboration of detail or [a] particularization of facts,'" *FTC v. On Point Cap. Partners, LLC*, 17 F.4th 1066, 1081 (11th Cir. 2021) (quoting *Stock Equip. Co. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990)).  Rather, a trial court "'need only make brief, definite, pertinent findings and conclusions upon the contested matters,'" provided its determinations are sufficient to allow an appellate court to conduct "meaningful" review.  *Id.* at 1080–81 (citations and internal quotation marks omitted).

In rendering its factual findings, a trial "court must weigh the evidence and may consider the witnesses' credibility."  *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993) (quoting *Chris Berg, Inc. v. Acme Min. Co., Inc.*, 893 F.2d 1235 (11th Cir. 1990) (per curiam)).  In doing so, a trial court must "resolve[ ] the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff."  *JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1209 (N.D. Fla. Aug. 6, 2010) (citation omitted).

On appeal, a trial court's "findings of fact—including [its] determinations of the credibility of witnesses and [the] weight of the evidence"—will be upheld unless they are clearly erroneous.  *Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir. 2016) (quoting *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007)); *see also*

Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). A party seeking to overturn a trial court's factual findings on appeal bears an "especially heavy" burden where the evidence is "largely testimonial" and the court had "the advantage of observing the witnesses and evaluating their credibility firsthand." *Sidman*, 841 F.3d at 1201 (quoting *Fischer*, 508 F.3d at 592). Legal conclusions, on the other hand, are reviewed de novo on appeal. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, 790 F.3d 1253, 1257 (11th Cir. 2015) (citing *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009)).

With this backdrop in mind, the Court turns to the merits of PeopleGuru's breach of contract claim. In a diversity case such as this one, the Court is bound by the substantive law of the forum state—here, Florida. *See Auto-Owners Ins. Co. v. Ralph Gage Contracting, Inc.*, 685 F. App'x 820, 821 (11th Cir. 2017) (per curiam) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[7]

To prevail on a contract claim under Florida law, a plaintiff must show that (1) there was a valid contract, (2) the defendant materially breached the contract, and (3) the plaintiff suffered damages. *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992)). There is no dispute in this case that the parties' Agreement constituted a valid contract.

---

[7] It is uncontested that Florida law controls here. *See, e.g.*, (Doc. 89 at 12); (Doc. 90 at 14).

The parties do part ways, however, as to whether Schwazze materially breached the Agreement.

To satisfy the element of breach, a plaintiff must demonstrate that a defendant's nonperformance of an obligation under the agreement went "to the essence of the contract." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1313 (11th Cir. 2019) (quoting *Sublime, Inc. v. Boardman's Inc.*, 849 So. 2d 470, 471 (Fla. Dist. Ct. App. 2003)).  In other words, a defendant's nonperformance must be of "such significance that it relieve[d] the injured party from further performance of its contractual duties." *Burlington & Rockenbach, P.A. v. Law Offices of E. Clay Parker*, 160 So. 3d 955, 960 (Fla. Dist. Ct. App. 2015) (citations omitted).  Whether an alleged breach is a material one is a factual issue to be decided by the trier of fact.  *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989); *Chetu, Inc. v. KO Gaming, Inc.*, 261 So. 3d 605, 606 (Fla. Dist. Ct. App. 2019).

As alluded to above, the matter of Schwazze's purported breach of the parties' Agreement revolves around the language of section 1.6.  As also noted earlier, that provision states, in pertinent part:

> The initial term of th[e] Agreement shall commence as of the execution date and shall continue until the First Anniversary Date.  *Thereafter, and unless either party delivers thirty (30) days written notice of nonrenewal prior to each Anniversary Date*[,] . . . the term of th[e] Agreement shall automatically renew for one (1) year periods on the Anniversary Date.

(Doc. 93-2) (emphasis added).

PeopleGuru argues that Schwazze violated section 1.6 because Schwazze did not transmit its notice of nonrenewal until October 31, 2022, which was only one

day—as opposed to thirty days—before the November 1, 2022, Anniversary Date. (Doc. 90 at 12–16). PeopleGuru further argues that Schwazze's untimely termination meant the Agreement automatically renewed for a one-year period on November 1, 2022. *Id.*

Schwazze counters that section 1.6 only required it to tender its nonrenewal notice any time in advance of November 1, 2022. (Doc. 89 at 14–15). In the alternative, Schwazze asserts that the provision's "prior to" language is susceptible to more than one reasonable interpretation, and that this phrase should be construed against PeopleGuru since it drafted the Agreement. (Doc. 89 at 4–5, 15–16).

The interpretation of a contract, including whether one of its terms is ambiguous, is a question of law. *Peacock Const. Co. v. Mod. Air Conditioning, Inc.*, 353 So. 2d 840, 842 (Fla. 1977); *LSQ Funding Group, L.C. v. EDS Field Services*, 879 F. Supp. 2d 1320, 1332 (M.D. Fla. 2012) ("Whether an ambiguity exists is a question of law."). In assessing whether an agreement is clear or ambiguous, a "court must first examine the plain language of the contract for evidence of the parties' intent." *See Hatadis v. Achieva Credit Union*, 159 So. 3d 256, 259 (Fla. Dist. Ct. App. 2015) (internal quotation marks and citations omitted); *Crawford v. Barker*, 64 So. 3d 1246, 1254–56 (Fla. 2011). A court undertaking this task must afford the words in the contract their plain and ordinary meaning. *See Beans v. Chohonis*, 740 So. 2d 65, 67 (Fla. Dist. Ct. App. 1999). If the contract's language is clear, the agreement "must be enforced pursuant to its plain language." *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 986 (Fla. 2015); *Beans*, 740 So. 2d at 67. If, on the other hand, there is a "genuine inconsistency, uncertainty,

13

or ambiguity in meaning . . . after resort to the ordinary rules of construction," the contested provision is deemed ambiguous. *Dahl-Eimers v. Mut. of Omaha Life Ins. Co.*, 986 F.2d 1379, 1382 (11th Cir. 1993) (citing *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So. 2d 938, 942 (Fla. 1979)); *see also State Farm Mut. Auto. Ins. Co. v. Mendez*, 70 So. 3d 566, 570 (Fla. 2011) (observing that a contract is ambiguous if it is susceptible to more than one reasonable interpretation and those interpretations cannot be fairly reconciled).

A contract is not ambiguous, however, "merely because the parties may differ as to interpretations of certain" contract provisions. *Pearson v. Caterpillar Fin. Servs. Corp.*, 60 So. 3d 1168, 1172 (Fla. Dist. Ct. App. 2011) (citation omitted); *see also Dahl-Eimers*, 986 F.2d at 1382. Instead, each party's interpretation must be "reasonably inferred from the terms of the contract." *Com. Cap. Res., LLC v. Giovannetti*, 955 So. 2d 1151, 1153 (Fla. Dist. Ct. App. 2007). An interpretation is reasonable only if it coheres with the "ordinary and customary meaning" of the contract's terms. *See Kel Homes, LLC v. Burris*, 933 So. 2d 699, 702 (Fla. Dist. Ct. App. 2006) (citation omitted). The "ordinary and customary meaning" is one that is most "natural" and "commonly understood in relation to the subject matter and circumstances" of a contract. *Sheldon v. Tiernan*, 147 So. 2d 167, 169 (Fla. Dist. Ct. App. 1962).

Applying these principles here, the Court finds that PeopleGuru's construction of section 1.6 is reasonable and that Schwazze's is not. Several considerations inform the Court's conclusion. To begin, the most "natural" and "ordinary" reading of the

14

contested language is that Schwazze had to afford PeopleGuru notice of nonrenewal thirty days in advance of the Anniversary Date, not any time leading up to that date. Indeed, the Court had to study the disputed language extensively before it was able to discern how Schwazze could view the language in the way that it did.

This natural and ordinary reading of the challenged verbiage also finds support in section 1.6 taken as a whole.  It is apparent from a review of the entirety of this provision that it places a premium on having a set, year-long contract period that renews (or does not renew) each annum on a specific date—i.e., the Anniversary Date. As referenced previously, for example, the Agreement states that if it is not terminated, "the term of th[e] Agreement shall automatically renew *for one (1) year periods on the Anniversary Date*."  (Doc. 93-2) (emphasis added).

Schwazze's interpretation of the disputed language, by contrast, would permit it to wait until the very last second before the Anniversary Date to alert PeopleGuru of its nonrenewal *and* then to set a termination date for itself at any time in the future, as long as the chosen date was at least thirty days after the nonrenewal notice.  This would lead to the anomalous result that Schwazze would be able to unilaterally create its own contract-period ranging from one month to a year or any time frame in between.  Such an interpretation is inconsistent with the regularly renewing annual contract structure established under a common sense reading of section 1.6.  *See Universal Prop. & Cas. Ins. Co. v. Johnson*, 114 So. 3d 1031, 1036 (Fla. Dist. Ct. App. 2013) (observing that a contract is to be read "so [a]ll the various provisions of a

15

contract . . . give effect to each [other]") (internal quotation marks and citations omitted).

PeopleGuru's construction of section 1.6 is additionally buttressed by the subject matter and circumstances surrounding the contract. *Sheldon*, 147 So. 2d at 169. As discussed earlier, Mr. Cangemi testified at trial that including a proviso in contracts which necessitates a notice of nonrenewal be tendered at least thirty days prior to a particular date—i.e., the Anniversary Date—provides "predictability" so that a company like PeopleGuru can plan its future business needs with confidence. (Doc. 85 at 20–21).

In light of the above, the Court finds as a matter of law that the language in section 1.6 is clear and unambiguous and that Schwazze violated that provision by waiting to give its nonrenewal notice until one day prior to the November 1, 2022, Anniversary Date. The Court also has no trouble finding that this breach was material. As evidenced by the testimony and exhibits received at trial, the requirement that Schwazze provide PeopleGuru with notice thirty days in advance of the Anniversary Date was a significant component of the Agreement. *See Burlington & Rockenbach, P.A.*, 160 So. 3d at 960.[8]

This brings the Court to the matter of damages. PeopleGuru seeks the "principal amount" of $123,990.33, along with pre-judgment interest through the date that judgment is entered. (Doc. 90 at 12). PeopleGuru arrives at the $123,990.33

---

[8] Given this determination, the Court need not address Schwazze's other contentions which are premised on its claim that section 1.6 is ambiguous. *See, e.g.,* (Doc. 89 at 15).

figure by assessing Schwazze the full price under the contract for the months of January and February 2023 on the theory—as explained above—that it was "active[ly] processing" Schwazze's account during this time frame, and then charging Schwazze a minimum monthly fee for the remainder of the renewal period ending on October 31, 2023.  (Doc. 92 at 6).    With respect to the matter of pre-judgment interest, PeopleGuru states that this sum is comprised of $10,502.50 for the period from January 1, 2023, through October 31, 2023, and an additional amount for the period from October 31, 2023, through the judgment date calculated at the per diem figure of $61.15.  *See* (Doc. 90 at 17–18).

Schwazze counters that it should only be liable for the reasonable costs for PeopleGuru's services between January 1, 2023, and either March 31, 2023, or October 31, 2023.  (Doc. 89 at 21).  Schwazze posits that such costs are either (a) $23,870.48 for what it considers to be PeopleGuru's base fees from January 2023 to October 2023, or (b) $3,349.95 for what Schwazze views to be the actual value of the services rendered by PeopleGuru during the time frame of January 1, 2023, to March 31, 2023.  *Id*. at 10.[9]

Where, as here, there is a material breach of a contract, the election of remedies doctrine applies.  *See Tampa Pipeline Transp. Co. v. Chase Manhattan Serv. Corp*., 928 F. Supp. 1568, 1584 (M.D. Fla. 1995), *aff'd sub nom., Tampa Pipeline v. Chase Manhattan*,

---

[9] It is uncontested that PeopleGuru was properly paid the full price for the services it provided Schwazze during the months of November 2022 and December 2022.  *See* (Doc. 91 at 8–9); (Doc. 92 at 6).

87 F.3d 1329 (11th Cir. 1996); *Rector v. Larson's Marine, Inc.,* 479 So. 2d 783, 785 (Fla. Dist. Ct. App. 1985). Under this doctrine, the injured party "may treat the contract as void and seek the damages[—known as 'reliance damages'—]that will restore [it] to the position [it] was in immediately prior to entering the contract." *Rector,* 479 So. 2d at 785. Alternatively, the injured party "may elect to affirm the contract, insist upon the benefit of [its] bargain, and seek the damages[—referred to as 'expectation damages'—]that would place [it] in the position [it] would have been in had the contract been completely performed." *Id.* These two remedies are mutually exclusive and cannot be simultaneously invoked. *See Tampa Pipeline*, 87 F. Supp. at 1584; *Pathway Fin. v. Miami Int'l Realty Co.,* 588 So. 2d 1000, 1005 (Fla. Dist. Ct. App. 1991).

It is evident from PeopleGuru's submissions that it has decided to affirm its Agreement with Schwazze and to recover expectation damages for the time frame from January 1, 2023, through October 31, 2023. (Doc. 90 at 5). After careful review, the Court finds that PeopleGuru is entitled to such damages, just not the amount it claims. Although the testimony and exhibits admitted at trial demonstrate PeopleGuru should recover for the services it rendered in January and February 2023, it should only be at the minimum monthly rate, not the full price. This is because PeopleGuru fails to establish under its damages model that it was "active[ly] processing" Schwazze's account during these months. *See* (Doc. 85 at 33) (stating that it was PeopleGuru's practice when a client was not engaging in active processing to

"take away" the other fees, which constituted "roughly half of their bill"); *see also* (Doc. 85 at 124); (Doc. 92 at 6).[10]

As for the amount of the minimum monthly fee, PeopleGuru asserts that the appropriate figure is $11,597.61. (Doc. 92 at 6). As referenced previously, it arrives at this sum by adding the Enterprise Guru base fee to the incremental fee for 659 employees, which is the number of workers Schwazze had at the time of their last payroll with PeopleGuru in December 2022.[11] (Doc. 86 at 68); (Doc. 85 at 144); *see* (Doc. 93-27).

Schwazze takes issue with the 659 employee figure, asserting that the minimum monthly fee should be predicated solely on the number of workers who actually "use[d]" PeopleGuru's systems in 2023. (Doc. 89 at 20–21). There are several flaws with this argument. As an initial matter, it does not comport with the Agreement's payment structure, which was grounded on the overall number of Schwazze's employees that Schwazze reported to PeopleGuru. *See* (Doc. 85 at 145); (Doc. 93-2); (Doc. 93-13); (Doc. 93-20). Further, it was clear from the evidence at trial that Schwazze's business during the relevant period was expanding, not contracting. In fact, as noted above, one of the reasons Schwazze sought to switch from PeopleGuru to a new vendor was because it had "simply outgr[own]" PeopleGuru. (Doc. 86 at 77–78). And lastly, Schwazze notably fails to cite any persuasive evidence in the

---

[10] To the extent PeopleGuru may be deserving of a larger recovery under a different damages model, it has waived any such contention.

[11] A tax rate of 8.81% is also factored into the calculation of this figure. (Doc. 93-27).

record showing that the number of its employees covered under the Agreement materially decreased in 2023.

This does not end the Court's computational exercise, however, as Schwazze is deserving of an offset stemming from the fact that PeopleGuru overcharged Schwazze in January 2023 by billing it the full price of $23,658.35,[12] rather than the minimum monthly fee of $11,597.61.  Multiplying the monthly fee by ten months (January 2023 to October 2023) and then subtracting Schwazze's January payment yields $92,317.75.  *See* (Doc. 92 at 6); (Doc. 93-27); (Doc. 93-14).  Accounting for this $92,317.75 figure, as well as for PeopleGuru's unpaid invoice of $6,810.30 for compiling and shipping the 1095s (Doc. 93-21) and the $978.53 in interest due on Schwazze's belated $7,163.29 payment in the Fall 2023 (Doc. 93-18); (Doc. 93-33); (Doc. 90 at 8), PeopleGuru is entitled to a base expectations damages figure of $100,106.58.

The final item in the Court's damages analysis is pre- and post-judgment intertest.  In a diversity contract case such as this one, the issue of prejudgment interest rate is governed by state law if the rate is not specified in the contract.  *See Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1257n.12 (S.D. Fla. 2017).  While the parties' Agreement states that "[a]ny payment not received from [Schwazze] by the due date will accrue interest at the maximum rate permitted by Law" (Doc. 93-3); (Doc. 90 at 11), the Agreement does not designate a particular rate.  As a result, the

---

[12] As discussed before, Schwazze paid this price in full in January 2023.  (Doc. 93-13).

Court must look to the Florida statutes for guidance, in particular Florida Statute Section 687.03(1).

Under that provision, the maximum rate permitted is 18% per annum where, as in this case, the judgment amount is less than $500,000.  *See* Fla. Stat. § 687.03(1). Because the Agreement does not expressly apply the operative interest rate to judgments entered on debts, however, this rate extends only to pre-judgment interest and not to post-judgment interest.  *See Whitehurst v. Camp*, 699 So. 2d 679, 680 (Fla. 1997) ("[U]nless a contract's terms explicitly provide for a specific interest rate to apply to a judgment entered on the debt, the contractual interest rate terminates at judgment and the post[-]judgment interest rate will be determined by statute.").

Federal law—namely, 28 U.S.C. § 1961(a)—dictates the post-judgment interest rate.[13]  *See Hirsch*, 232 F. Supp. at 1257 n.12 (S.D. Fla. 2017) ("Unlike the rate for pre[-]judgment interest, in all cases in federal court, including diversity cases, the post-judgment interest rate to be applied is determined by federal law pursuant to 28 U.S.C. § 1961.")  (citing *G.M. Brod & Co., Inc. v. U.S. Home Corp.,* 759 F.2d 1526, 1542 (11th Cir. 1985).  Accordingly, the Court finds that PeopleGuru is entitled to $100,106.58 in damages, together with pre-judgement interest at a rate of 18% per annum for the period up to the date of Judgment, and post-judgment interest at the federal statutory rate from the date of Judgment.  28 U.S.C. § 1961(a).

---

[13] Section 1961(a) states, in pertinent part, that post-judgment "interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average [one]-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).

B.

In an effort to avoid this outcome, Schwazze raises several affirmative defenses in its post-trial submission. *See* (Doc. 89 at 16–24). At oral argument, however, it limited these defenses to two—unjust enrichment and failure to mitigate damages. Schwazze bears the burden of proving each of these defenses. *Paladin Shipping Co. v. Star Cap. Fund, LLC*, 491 F. App'x 42, 44 (11th Cir. 2012) ("The burden of proving each element of an affirmative defense rests on the party that asserts the defense.") (citing *Custer Med. Ctr. v. United Auto. Ins. Co.,* 62 So. 3d 1086, 1097 (Fla. 2010)).

Under Florida law, unjust enrichment is "a legal fiction designed to permit recovery by contractual remedy in those cases where there is no contract." *Dooley v. Gary the Carpenter Constr., Inc.*, 388 So. 3d 881, 883 (Fla. Dist. Ct. App. 2023) (citation omitted). When there is a contract, however, "claims arising out of the contractual relationship will not support a claim for unjust enrichment." *Reese v. JPMorgan Chase & Co.*, 686 F. Supp. 2d 1291, 1309 (S.D. Fla. 2009) (citing *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. Dist. Ct. App. 2009)). Stated differently, "a claim for unjust enrichment cannot be pursued where an express contract exists between the parties concerning the same subject matter." *Premier Gaming Trailers, LLC v. Luna Diversified Enters., Inc.*, 304 F. Supp. 3d 1270, 1284 (M.D. Fla. 2018) (internal quotation marks and citation omitted); *see also Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1341 (S.D. Fla. 2012) ("Under Florida law, unjust enrichment is an equitable remedy which

22

necessarily fails upon a showing that an express contract exists.") (citing *Williams v. Bear Stearns & Co.,* 725 So.2d 397, 400 (Fla. Dist. Ct. App. 1998)).

Schwazze attempts to evade this limitation by asserting that the services PeopleGuru provided Schwazze after January 1, 2023, were outside of the scope of the parties' Agreement and thus created a new "implied contract" to which unjust enrichment could apply. (Doc. 89 at 16–19). The defect in this argument is that for the reasons explained above, Schwazze's unjust enrichment defense relates to the same "subject matter" as the Agreement, *Premier Gaming Trailers*, 304 F. Supp. 3d at 1284, and, indeed, falls squarely within the ambit of section 1.6. Schwazze's unjust enrichment defense therefore fails.

Schwazze's reliance on the failure to mitigate damages defense does not fare any better. Sometimes known as the doctrine of avoidable consequences, this defense precludes an injured party from recovering "damages inflicted by a wrongdoer that the injured party could have reasonably avoided." *Sys. Components Corp. v. Fla. Dep't of Transp.*, 14 So. 3d 967, 982 (Fla. 2009). Of significance here, however, this defense admits of an exception where the injured party and the wrongdoer are parties to a non-exclusive contract. *See In re Standard Jury Instructions--Cont. & Bus. Cases*, 116 So. 3d 284, 339 (Fla. 2013) (stating that "non-exclusive contracts are generally considered an exception to the doctrine of avoidable consequences"); *Graphic Assocs., Inc. v. Riviana Rest. Corp.*, 461 So. 2d 1011, 1014 (Fla. Dist. Ct. App. 1984) (observing that a non-exclusive contract is normally deemed to be an exception to the duty to mitigate damages). A non-exclusive contract exists where a seller is freely able to enter into

identical contracts with many other buyers simultaneously. *See Graphic Assocs., Inc.*, 461 So. 2d at 1014.

In this case, Schwazze does not point to any credible evidence that the parties' Agreement materially constrained PeopleGuru from contracting with other customers. *Paladin Shipping*, 491 F. App'x at 44. Schwazze's reliance on this defense thus fails as well.[14]

C.

One remaining matter requires the Court's attention. As discussed at the outset, Schwazze orally moved during the trial for a directed verdict and a judgment on partial findings (Docs. 80, 82), and the Court reserved ruling on the motions. The Court now denies these motions as moot given its findings of fact and conclusions of law as set forth herein. *See Ebanks v. Old Republic Equity Credit Servs, Inc.*, 2016 WL 7321291, at *4 (M.D. Fla. Dec. 16, 2016) (denying as moot a motion for directed verdict based upon the issuance of the findings of fact and conclusions of law).

III.

Based on the foregoing, it is hereby ORDERED:

1.    The Clerk of Court is directed to enter judgment in favor of PeopleGuru, Inc. and against Medicine Man Technologies, Inc., d/b/a/ Schwazze, in the amount of $100,106.58, together with pre-judgement interest at the rate of 18% per annum for

---

[14] In service of both affirmative defenses, Schwazze sought to introduce evidence at trial of various sums it offered PeopleGuru to settle this matter. (Doc. 86 at 74–75). Even if the Court were to consider this proof, it would not alter the Court's analysis.

the period up to the date of Judgment, and post-judgment interest at the statutory rate described in 28 U.S.C. § 1961(a) from the date of Judgment.

2.    Schwazze's ore tenus motions for a directed verdict and judgment on partial findings (Docs. 80, 82) are denied as moot.

3.    The Clerk of Court is directed to terminate any other pending motions and deadlines and to close the case.

4.    Motion(s) seeking an award of attorney's fees and/or costs must be filed within the time frame and in the manner prescribed by Local Rule 7.01.  *See* M.D. Fla. R. 7.01.

SO ORDERED in Tampa, Florida, this 30th day of September 2025.

HONORABLE CHRISTOPHER P. TUITE
United States Magistrate Judge

Copies to:
Counsel of record